IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS PESHE, | ) | CASE NO. 1:14-cv-02359 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Nicholas Peshe ("Plaintiff" or "Peshe") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his applications for social security disability benefits. Doc. 1. This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 12. As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I. Procedural History

Peshe filed an application for Child's Insurance Benefits ("CIB")[1] and an application for

Supplemental Security Income ("SSI") on February 29, 2012.[2] Tr. 17, 220-225, 226-232.

---

[1] Under 42 U.S.C. § 402(d), child's insurance benefits are available to children of an individual who dies a fully or currently insured individual provided that certain requirements are met, including that the the applicant, at the time the application for child's insurance benefits is filed, must be unmarried and "(i) either had not attained the age of 18 or was a full-time elementary or secondary school student and had not attained the age of 19; or (ii) is under a disability . . . which began before he attained the age of 22" and must have been dependent on the deceased at the time of his death. *See* 42 U.S.C. § 402(d); *see also* Tr. 17.

[2] The CIB and SSI regulations are generally identical. For convenience, citations to the CIB and SSI regulations regarding disability determinations will be made to the CIB regulations found at 20 C.F.R. § 404.1501 et seq. The

Peshe's application for Child's Insurance Benefits was based on the earning record of his father Dana Andrew Peshe who passed away on October 28, 2011.  Tr. 226.  In both applications, Peshe alleged a disability onset date of June 1, 2000.  Tr. 17, 220, 227.   Peshe alleged disability due to bipolar disorder, Tourette's syndrome, depression, attention deficit disorder, passive aggressive disorder, obsessive compulsive disorder, scoliosis, back injury, neck injury, and astigmatisms in both eyes.  Tr. 63, 77, 91, 107, 122, 125, 129, 132, 135, 139, 248.

Peshe's applications were denied initially and upon reconsideration by the state agency.  Tr. 122-140.  Peshe requested an administrative hearing.  Tr. 147-148.  On June 26, 2013, Administrative Law George D. Roscoe ("ALJ") conducted an administrative hearing.  Tr. 31-61.

In his July 9, 2013, decision, the ALJ determined that Peshe had not been under a disability from June 1, 2000, through the date of the decision.  Tr. 14-30.  Peshe requested review of the ALJ's decision by the Appeals Council.  Tr. 12.  On August 29, 2014, the Appeals Council denied Peshe's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence[3]

### A.    Personal, educational and vocational evidence

Peshe was born in 1988.  Tr. 34, 220, 226.  He was 24 years old at the time of the hearing.  Tr. 34.  He completed school through 9th grade.  Tr. 37, 50.  He can perform simple mathematics and is able to read and write.  Tr. 37.  Peshe's driver's license was suspended and he was incarcerated for approximately nine months in 2011-2012 for fleeing from the police.  Tr.

---

analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the CIB cite (i.e., 20 C.F.R. § 404.1501 corresponds to 20 C.F.R. § 416.901).

[3] Peshe does not challenge the ALJ's findings regarding his alleged physical impairments.  Accordingly, the evidence summarized herein pertains generally to his alleged mental impairments.

35-36, 42-44.  At the time of the hearing, Peshe was living with and receiving support from his mother.  Tr. 44.  He has never been married.  Tr. 35.

**B.      Medical evidence**

**1.      Treatment history**

Dr. Stephen B. Zinn, M.D., first saw Peshe on October 5, 2001, for a psychiatric consultation due to oppositional behaviors at home and at school and issues with his temper.[4] Tr. 375, 377.  Through 2004, Dr. Zinn treated Peshe for mood disorder, NOS (a childhood version of adult bipolar disorder); Tourette's syndrome; and features of a mild attention deficit disorder.  Tr. 377.  Dr. Zinn indicated that Peshe's mood issues and Tourette symptoms had always responded to medication when Peshe was taking his medication regularly.  Tr. 378.  Dr. Zinn indicated that he felt that Peshe needed regular psychiatric treatment.  Tr. 378.  After treating Peshe through September 2004, Dr. Zinn saw Peshe again in March 2012.  Tr. 375, 379-382.  During his March 2012 session with Peshe, Dr. Zinn indicated that he "was impressed with the prominent symptoms of Bipolar Disorder, Polysubstance Abuse Disorder, and probable Axis II Disorder."  Tr. 375.

While incarcerated, on July 9, 2011, Peshe was seen for a psychiatric evaluation.  Tr. 425.  Peshe reported anxiety and a history of tics.  Tr. 425.  Peshe's mood was "okay;" his affect was euthymic; and he was engaged, pleasant and cooperative.  Tr. 425.  He was diagnosed with mood disorder, NOS, and prescribed Elavil.  Tr. 425.  On December 16, 2011, another psychiatric evaluation was performed.  Tr. 424.  During that evaluation, Peshe was calm and cooperative.  Tr. 424.  His speech was spontaneous and his mood was "ok."  Tr. 424.  His affect

---

[4] On February 17, 2006, and on May 14, 2012, Dr. Zinn summarized his treatment history of Peshe.  Tr. 375, 377-378.

was euthymic and his thought process was logical.  Tr. 424.  Peshe's diagnosis was mood

disorder, NOS, with his symptoms being controlled with Elavil.  Tr. 424.

On April 26, 2012, Peshe saw Dr. Toni Love-Johnson, M.D., at MetroHealth for a

psychiatric evaluation.  Tr. 607, 640-649.  Dr. Johnson noted that Peshe had seen a psychiatrist

while incarcerated and had been prescribed Amitriptyline.  Tr. 641.  Dr. Johnson also noted that

Peshe had recently seen Dr. Zinn and he had started Peshe on Abilify.  Tr. 641.  Peshe reported

that with the Abilify he had better patience and concentration.  Tr. 641.  Dr. Johnson's diagnoses

included mood disorder (rule out bipolar disorder) and antisocial and narcissistic personality

(grandioses) disorder traits, and Dr. Johnson assessed a GAF score of 41-50.[5]  Tr. 644.  Dr.

Johnson recommended and Peshe agreed to increase his Abilify dose.  Tr. 645.  Also, Dr.

Johnson referred Peshe for counseling.  Tr. 645.

Thereafter, on May 24, 2012, Peshe began seeing counselor Richard Johnson, M.Ed.,

PCC, at MetroHealth for behavioral health counseling and therapy.  Tr. 607-609.  During his

initial session with Peshe, Mr. Johnson observed that Peshe was articulate and well-spoken but

showed some edginess and had some issues with authority and the legal process and

demonstrated a tendency towards grandiosity and some self-entitlement.  Tr. 607.  Mr. Johnson

noted that potential bipolar symptoms were evident and Peshe was receptive to therapy.  Tr. 609.

Mr. Johnson recommended that Peshe continue with individual therapy along with psychiatric

follow up and medication compliance.  Tr. 609.

On June 21, 2012, Peshe saw Mr. Johnson for therapy.  Tr. 561-570, 942-946.  Peshe's

mother brought him to his therapy session but remained in the waiting room during the session.

---

[5] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a
hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical
Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric
Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational,
or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

Tr. 942.  Peshe reported that he and his mother had been arguing over whether she should obtain life insurance.  Tr. 942.  Peshe's mother had recently had a stroke and he was concerned about what would happen to him if his mother died.  Tr. 942.  Mr. Johnson indicated that Peshe was continuing to show narcissistic traits along with a sense of entitlement and grandiosity.  Tr. 942. Peshe had filed for social security disability and appeared to be interested in using disability as a stepping stone for alternative career possibilities.  Tr. 942.  He was expecting to take his GED in a few weeks.  Tr. 942.  Peshe reported compliance with his psychiatric medication.  Tr. 942.  He was taking Abilify and Elavil and noted some benefits.  Tr. 942.  On mental status examination, Mr. Johnson indicated that Peshe was cooperative, agitated and appropriate; his speech was spontaneous and of normal rate and flow; he was talkative; his thought process was logical and organized; he expressed feelings of agitation; his judgment and insight were good; his mood was euthymic; and his affect was constricted.  Tr. 944.  Mr. Johnson noted no change in symptoms and recommended that Peshe continue with individual therapy, pharmacological follow up and medication compliance.  Tr. 944.

On July 25, 2012, Peshe saw Mr. Johnson for therapy.  Tr. 530-536, 927-931.  Peshe indicated that he was "doing ok overall" but was angry about not being approved for social security.  Tr. 927.  Peshe's affect was "comparatively mellow and reflective" and he was "notably less grandiose and narcissistic in presentation."  Tr. 927.  He continued to demonstrate a "sense of entitlement."  Tr. 927.  Peshe was talkative, engaged and participated in the session. Tr. 927.  Peshe was continuing to view social security benefits as a "stepping stone to recovery." Tr. 927.  Peshe reported compliance with his psychiatric mediation and understood that being compliant was helping him feel better.  Tr. 927.  Peshe was pursuing housing possibilities through CMHA because he "need[ed] to get back on [his] own."  Tr. 927.  Peshe was receptive

to therapy and appreciated the benefits of parallel treatment, i.e., medication and therapy.  Tr. 927.

On August 2, 2012, Peshe saw Dr. Johnson for follow up.  Tr. 517-522, 918-922.  Peshe indicated that he was interested in reapplying for social security benefits because he did not believe he was able to work at the time.  Tr. 919.  Peshe noted that it was difficult for him to get a job with his felony conviction.  Tr. 919.  He informed Dr. Johnson that his fuse was "real short" and he was more aware of his mood impairment – he reported a more depressed mood and having negative thoughts about himself.  Tr. 919.  Peshe noted having an interest in obtaining his GED but was unable to do so because of transportation and financial limitations.  Tr. 919.  He indicated that, if he was approved for disability, he would feel more motivated to obtain a GED and maybe work.  Tr. 919.  When Dr. Johnson inquired about Peshe's focus and concentration, Peshe indicated that he was easily bored and physically restless.  Tr. 919.  On mental status examination, Dr. Johnson indicated that Peshe was cooperative, calm and quite formal in his interactions; his speech was clear, with less rambling; his thought process was fairly logical, organized and goal oriented; his judgment and insight was "fairly good but has some grandiosity and entitlement;" he had no abnormal psychotic thoughts; and his mood was fairly euthymic.  Tr. 919.  Dr. Johnson diagnosed mood disorder and indicated that Peshe's symptoms were in partial remission.  Tr. 920.  Dr. Johnson continued Peshe's medication at the same doses.  Tr. 920.

On August 21, 2012, Peshe saw Mr. Johnson for therapy.  Tr. 481-487, 891-896.  Mr. Johnson noted that Peshe continued to be talkative, confident and narcissistic.  Tr. 891.  Peshe had been picking up some odd jobs and selling goods on Ebay to bring in some money and to keep himself busy and out of trouble.  Tr. 891.  Peshe reported compliance with his medication and noted the benefits and importance of remaining compliant with his medication.  Tr. 891.

On October 8, 2012, Peshe saw Mr. Johnson for therapy. Tr. 1045-1051. Peshe was doing okay. Tr. 1045. He was very talkative and continued signs of some narcissism, sense of entitlement, and intermittent grandiosity. Tr. 1045. He was engaged and participative with a constricted affect. Tr. 1045. Peshe was investing in equipment for a landscaping business and was taking GED classes. Tr. 1045. Mr. Johnson noted that Peshe's symptoms were unchanged and Mr. Johnson recommended that Peshe continue with individual therapy and maintain pharmacological follow-up and medication compliance. Tr. 1047.

On November 26, 2012, Peshe saw Mr. Johnson for therapy. Tr. 1027-1033. Mr. Johnson noted that Peshe demonstrated a "[n]otably more level presentation – no significant signs of entitlement, self-centeredness and grandiosity evidence in earlier sessions." Tr. 1028. Peshe was continuing to work towards starting a landscaping/snow removal business. Tr. 1028. He was progressing slowly but had a goal-oriented focus. Tr. 1028. Mr. Johnson's impression was that Peshe was stabilizing. Tr. 1029. Peshe's treatment plan remained unchanged. Tr. 1030.

Peshe saw Mr. Johnson on February 26, 2013, for therapy. Tr. 967-972. Mr. Johnson discussed with Peshe Dr. Johnson's recent medication check-up and noted that Dr. Johnson had changed Peshe from Abilify to Geodon. Tr. 968. Peshe was agitated with an elevated presentation. Tr. 968. His sense of entitlement seemed more evident with some grandiosity. Tr. 968. Peshe was talkative and edgy with a somewhat pressured-constricted, blunted affect. Tr. 968. Peshe reported that he had used cocaine, bath salts and marijuana for a couple of weeks. Tr. 968. He also indicated that he was drinking more than he should. Tr. 968. Peshe had moved out of his mother's house and was living with his grandmother because he did not feel that his mother trusted/believed him. Tr. 968. His mother had questioned him about his drug use. Tr.

968. At Peshe's request, Mr. Johnson indicated a willingness to pursue joint therapy sessions with Pehse and his mother and/or one on one therapy sessions between Mr. Johnson and Peshe's mother. Tr. 969. Mr. Johnson noted that there were significant new stressors but did not recommend changes to Peshe's treatment plan. Tr. 970.

### 2. Opinion evidence

#### a. Treating psychiatrist

On November 6, 2012, Dr. Johnson completed a Medical Source Assessment (Mental), rating Peshe's mental abilities in 20 categories on a scale of 1 to 5, with a "1" being able to perform designated task or function with no observable limits and a "5" being unable to perform designated task or function on a regular, reliable and sustained schedule.[6] Tr. 961-962. Dr. Johnson assessed neither a "1" nor "5" in any category.

Dr. Johnson assessed a "2" in two categories: (1) ability to be aware of normal hazards and take appropriate precautions; and (2) ability to set realistic goals or make plans independently of others. Tr. 962.

Dr. Johnson assessed a "3" in eight categories: (1) ability to remember locations and work-like procedures; (2) ability to understand and remember very short, simple instructions; (3) ability to carry out very short and simple instructions; (4) ability to make simple work-related choices; (5) ability to ask simple questions or request assistance; (6) ability to maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness; (7) ability to

---

[6] The other rating choices were: 2 – able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) no more than 10 percent of the work day or work week (i.e., one hour or less/day or one-half day or less/week); 3 – able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) from 11-20 percent of the work day or work week (i.e., more than one hour/day or more than one-half day/week); and 4 – able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) more than 20 percent of the work day or work week (i.e., more than one hour and up to two hours/day or one-half to one day/week). Tr. 961.

respond appropriately to changes in the work setting; and (8) ability to travel in unfamiliar places or use public transportation.  Tr. 961-962.

Dr. Johnson assessed a "4" in the remaining ten categories: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods of time; (4) ability to perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; (5) ability to sustain ordinary routine without special supervision; (6) ability to work in coordination with or proximity to others without being distracted by them; (7) ability to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) ability to interact appropriately with the general public; (9) ability to accept instructions and respond appropriately to criticism from supervisors; and (10) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 961-962.

Dr. Johnson opined that as a result of his impairments Peshe would likely be absent from work about three days per month.  Tr. 962.  In narrative form, Dr. Johnson explained that Peshe had:

> Very difficult ability to interact on appropriate level required for work setting. History of verbal and physical outburst[s] which were worse when under the influence of substances & not taking psychiatric medication.

Tr. 962.

### b.    Consultative psychologist

On June 7, 2012, consultative psychologist Charles F. Misja, Ph.D., conducted a psychological evaluation.  Tr. 473-480.  Peshe reported having difficulty getting along with

people; difficulty concentrating; and being frustrating to others.  Tr. 473.  He reported having

difficulty following instructions and taking orders from others.  Tr. 473.  He indicated that he

had been diagnosed with Tourette's syndrome and that stress exacerbated his symptoms.  Tr.

473-474.  Dr. Misja noted that Peshe was "quite talkative and needed to be redirected several

times."  Tr. 476.  Dr. Misja indicated that Peshe's "[a]ffect was blunted and [his] mood [was]

slightly depressed and mildly labile."  Tr. 476.  Dr. Misja observed that Peshe was "mildly

anxious during the interview as manifested by rapid speech."  Tr. 476.   Dr. Misja noted there

was no evidence of hallucinations, delusions, or ideas of reference.  Tr. 476.

Peshe rated his depression as a 9-10 on most days.  Tr. 476.  Peshe stated he had

problems falling asleep because of racing thoughts but stated that the medication helped him stay

asleep.  Tr. 476.  He indicated that his energy level was not good and he did little exercise.  Tr.

476.  He said he had gained weight in part due to medication he was taking.  Tr. 476.

Dr. Misja's diagnoses included "bipolar disorder by history as reported by claimant with

no supporting evidence," rule out PTSD, and antisocial personality disorder.  Tr. 477.  Dr. Mijsa

assessed a GAF score of 60.[7]  Tr. 477.  In his summary, Mr. Misja commented that Peshe "took

great pains to emphasize his many alleged mental health diagnoses and exaggerated them."  Tr.

478.

Dr. Misja assessed Peshe's functional abilities.  Tr. 478.  With respect to Peshe's abilities

and limitations in understanding, remembering and carrying out instructions, Dr. Misja found

that Peshe would "have no problem understanding and implementing ordinary instructions from

an intellectual perspective."  Tr. 478.  Dr. Misja found that, in the area of maintaining attention

and concentration and in maintaining persistence and pace to perform simple tasks and to

---

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

perform multi-step tasks, Peshe's problems would likely be in the moderate to severe range noting that Peshe had no problems concentrating and persisting during the brief screening done by Dr. Misja but Peshe believed that he had so many mental health problems that he would be unable to work and, in fact, had never held a job.  Tr. 478.  With respect to Peshe's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, Dr. Misja concluded that Peshe's problems in this area would likely be severe, noting that Peshe justified his past legal problems by saying the cops were hassling him and Peshe had a personality disorder manifested by Peshe saying several times that he does not like to be told what to do and, when he is told what to do, he does not do it.  Tr. 478-479.  Dr. Misja found that Peshe would likely have severe problems in the area of responding appropriately to work pressures in a work setting because he had never had a job and does not like structure or authority figures telling him what to do.  Tr. 479.

### c. State agency reviewing psychologists

On June 20, 2012, state agency reviewing psychologist Roseann Umana, Ph.D., reviewed Peshe's file and completed a psychiatric review technique and mental RFC assessment.  Tr. 68, 72-74.  As part of her psychiatric review technique, Dr. Umana opined that Peshe had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 68.  Additionally, as part of her mental RFC assessment, Dr. Umana opined that:

> The medical evidence indicates the clt should have limited interaction with the public and coworkers.  He is capable of understanding and following instructions. He is capable of maintaining attention, concentration, pace and persistence.  He should avoid work environments with high demands or strict production quotas due to decreased stress tolerance.

Tr. 73.

11

Upon reconsideration, on October 25, 2012, state agency reviewing psychologist Irma Johnston, Psy.D., completed a psychiatric review technique and mental RFC assessment.  Tr. 98, 101-103.  Dr. Johnston agreed with Dr. Umana's opinion that Peshe had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 98.  Dr. Johnston generally agreed with Dr. Umana's mental RFC assessment.  Tr. 101-103.  However, with respect to the ability to interact appropriately with the general public, Dr. Johnston found Peshe markedly limited (Tr. 102) whereas, Dr. Umana had found Peshe moderately limited in this area (Tr. 73).  In any event, Dr. Johnston concluded that Peshe would have the ability to work with supervisors and coworkers on an occasional basis in a nonpublic work setting.  Tr. 102.

## C.    Testimonial evidence

### 1.    Peshe's testimony

Peshe was represented by counsel and testified at the hearing.  Tr. 34-51, 59-61.

Peshe indicated that he had been unable to work since June of 2000 because he was diagnosed with Tourette's syndrome, bipolar disorder, and scoliosis.  Tr. 37.  Peshe was taking Neurontin, Abilify and Elavil.  Tr. 37-38, 50.  He stated that the medication helped relieve his symptoms about 50 percent.  Tr. 37-38.  His medication helps with his tics and depression.  Tr. 50.  However, he still experiences tics on daily basis as a result of Tourette's syndrome.  Tr. 37-38, 39-40.  The only side effect Peshe reported from his medication was serious weight gain because of psychiatric medication that he was taking.  Tr. 35, 38, 50.  He had gained about 35 to 40 pounds over one year.  Tr. 35.  Peshe attends physical therapy about once every three months for his back condition and performs exercises at home on a daily basis.  Tr. 39, 46.  Regarding

his back pain, Peshe reported a pain level of seven on a scale of one to ten with a lot of tingling and throbbing.  Tr. 39.

Peshe sees his psychiatrist Dr. Toni Jones every 90 days for his mental health issues as well as his Tourette's.  Tr. 40, 41.  He also sees his counselor Richard Johnson every 30 to 60 days.  Tr. 41.  Peshe stated he had no problems with crowds of people.  Tr. 41.  He is able to deal with strangers "[t]o an extent."  Tr. 42.  Peshe is sometimes distracted while watching television because of his Tourette's.  Tr. 41-42.  He stated that his bipolar disorder also impacts his ability to concentrate and stay on task.  Tr. 47-48.  Peshe has mood swings on a daily basis with his mood being more depressed than manic.  Tr. 47.  When depressed, Peshe keeps to himself and really does not communicate with anyone.  Tr. 47.  When manic, Peshe gets into arguments and has verbal confrontations with others.  Tr. 47.

Peshe uses the computer or watches television approximately one to two hours each day. Tr. 42, 46.  He occasionally shops with his mother and occasionally visits with friends or relatives.  Tr. 45, 46.  Peshe has a past history of drug use.  Tr. 42-43.  He reported he had not used illegal substances since being released from prison in February 2012.  Tr. 43, 59-60.  He stated that, when he used illegal substances, his psychiatric condition worsened.  Tr. 60.  Peshe dropped out of high school because he was on medication and his conditions were restricting his ability to concentrate and his parents were going through a divorce.  Tr. 48.

Peshe tried working as a landscaper when he was 15 years old but was unable to hold that job because of his mental and physical limitations.  Tr. 47-48.  He believes he is unable to work because of his conditions, especially because he has confrontations with people.  Tr. 49.  He indicated he has one friend with whom he meets once or twice a month.  Tr. 49.  He does not argue with that friend.  Tr. 49.  He does have a lot of differences with his mother.  Tr. 49.  At

times, he gets along with other family members but, at times he does not get along with them. Tr. 49.

### 2.    Vocational Expert's testimony

Vocational Expert ("VE") Irmo Marini testified at the hearing.  Tr. 51-59, 149-172, 197-198.  The ALJ indicated that he had determined that Peshe had no vocationally relevant work experience.  Tr. 52.  The ALJ then asked the VE to assume an individual of Peshe's age and educational background who was limited to light work with the following nonexertional limitations: no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to hazards, meaning heights, machinery, or commercial driving; performance of simple, routine tasks in a low stress setting with no fast pace, strict quotas, or frequent duty changes, in a non-public setting and superficial interpersonal interactions.  Tr. 52-53.  The VE indicated that the following jobs would be available to the described individual: (1) office cleaner, an unskilled, light job with over 11,400 positions in Ohio and over 381,000 nationwide; (2) garment sorter, an unskilled, light job with approximately 2,300 positions in Ohio and over 223,000 nationwide; and (3) house sitter, an unskilled, light job with approximately 770 positions in Ohio and 22,000 nationwide.  Tr. 53.

The ALJ then asked the VE whether adding to the first hypothetical the additional limitation of being off task 20 percent of the time due to symptoms relating to medically determinable impairments would affect an individual's ability to perform jobs existing in significant numbers in the economy.  Tr. 54.  The VE indicated that being off task 20 percent of the time would erode the occupational based such that there would be no jobs available for the described individual.  Tr. 54.

In response to Peshe's counsel's questions, the VE indicated that he would reduce the job incidence numbers for the three cited positions by 40 percent if the individual described in the ALJ's first hypothetical would be absent 3 days per month.  Tr. 54-57.  The VE also indicated that, if an individual was unable to work around others and had to work in isolation, meaning only minutes of contact each day with other individuals, then there would likely be no jobs available for that individual.  Tr. 58.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his July 9, 2013, decision, the ALJ made the following findings:[10]

1.    Peshe was born in 1988 and had not attained the age of 22 as of June 1, 2000, the alleged onset date; he attained the age of 22 in 2010.  Tr. 19.

2.    Peshe had not engaged in substantial gainful activity since June 1, 2000, the alleged onset date.  Tr. 19.

3.    Peshe had the following severe impairments: bipolar disorder; scoliosis of the spine; Tourette's syndrome; and history of polysubstance abuse.[11] Tr. 19.

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[10] The ALJ's findings are summarized.

[11] The ALJ found Peshe's amblyopia with astigmatism to be a non-severe impairment.  Tr. 19-20.

4.      Peshe did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 20-21.

5.      Peshe had the RFC to perform light work except: no climbing of ladders, ropes and scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, couching, and crawling; no exposure to hazards, which includes heights, machinery and commercial driving; and limited mentally to performing simple routine tasks in a low stress setting (no fast pace, strict quotas or frequent duty changes), in a non-public setting involving superficial interpersonal interactions.  Tr. 21-23.

6.      Peshe had no past relevant work.  Tr. 23.

7.      Peshe was born in 1988 and was 11 years old, on the alleged disability onset date; he attained age 22 in 2010.  Tr. 24.

8.      Peshe had a limited education and was able to communicate in English. Tr. 24.

9.      Transferability of job skills was not an issue because Peshe had no past relevant work.  Tr. 24.

10.     Considering Peshe's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Peshe could perform, including office cleaner, garment sorter, and house sitter.  Tr. 24-25.

Based on the foregoing, the ALJ determined that Peshe had not been under a disability from June 1, 2000, through the date of the decision.  Tr. 25.

## V. Parties' Arguments

Peshe argues that the ALJ did not comply with the treating physician rule when evaluating the opinion of his psychiatrist Dr. Toni Johnson. Doc. 15, pp. 13-17.  Peshe also argues that the ALJ erred in assessing the opinion of consultative examining psychologist Dr. Charles Misja. Doc. 15, pp. 17-19.

The Commissioner contends that the ALJ properly discounted Dr. Johnson's opinion because Dr. Johnson's overall assessments were not consistent with or supported by the record as

a whole. Doc. 17, pp. 9-13. The Commissioner also argues that the ALJ discussed and considered Dr. Misja's consultative findings and the lack of specific assignment of weight to Dr. Misja's opinion was harmless. Doc. 17, pp. 13-17.

## VI. Law & Analysis

### A. Reviewing standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B. The ALJ properly evaluated the medical opinion evidence

#### 1. <u>Dr. Johnson</u>

Peshe argues that the ALJ did not adhere to the treating physician rule when evaluating the opinion of his treating psychiatrist Dr. Johnson.  Doc. 15, pp. 13-17.  He contends that the ALJ's determination that Dr. Johnson's opinion was not supported by the record, without further elaboration, was error.  Doc. 15, pp. 13-17.  Peshe contends that, had the ALJ given weight to Dr. Johnson's opinion, the result would have been different and a finding of disability would have been made because Dr. Johnson opined that Peshe would be unable to work with others at all and opined that Peshe would likely miss three days of work per month.  Doc. 15, pp. 16-17.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged

to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Here, the ALJ considered and discussed Peshe's subjective complaints concerning symptoms resulting from his mental health impairments along with Peshe's mental health treatment history. *See e.g.,* Tr. 20 (discussing mood swings, manic behavior, and problems in interacting with others), Tr. 22 (discussing MetroHealth, Department of Rehabilitation and Correction, and Dr. Zinn's mental health treatment records). For example, when discussing Peshe's medical treatment history, the ALJ found that:

> Records from MetroHealth Medical Center confirm the claimant's history of Tourette's syndrome, with tics responding to medication (exhs. 3F, 11F, 13F, 15F). Outpatient records from MetroHealth also note the claimant's bipolar disorder and polysubstance abuse in reported remission, with generally euthymic mood and no evidence of extreme mood changes, disrupted processes or psychosis (exhs. 3F, 11F, 13F, 15F). These records also note claimant's "sense of entitlement" and history of performing odd jobs for spending money when needed (exhs. 3F, 11F, 13F, 15F).

Tr. 22.

Further, consistent with the treating physician rule, the ALJ discussed and explained the weight assigned to Dr. Johnson's medical opinion, stating:

> The undersigned rejects the Exhibit 14F medical source statement of Toni Johnson, M.D., as unsupported by the record, although the undersigned notes the comment in this report indicating that the claimant's outburst worsen when he is under the influence of substances and not taking prescribed medication (exh. 14F). The undersigned concurs with the claimant's assertion that his substance abuse is not material to the determination of disability (exh. 15E). In this case, the claimant has known periods of sobriety from cocaine, cannabis and opiates, which demonstrate the claimant's work-related functioning improve with abstinence (see, e.g., 12F, SSR 13-2p, 20 CFR 404.1530 and 416.930). Likewise, although the undersigned concurs with the PRTF assessed by the State agency psychological consultants, considering the combined effect of the claimant's impairments, the undersigned finds a more restricted physical and mental residual functional capacity than that assessed by the State agency medical and psychological consultants at Exhibits 1A, 2A, 5A, 6A.

Tr. 23.

In challenging the ALJ's evaluation of Dr. Johnson's opinion, Peshe contends that the ALJ incorrectly concluded that Peshe's mental health records reflected that Peshe had no disrupted thought processes or psychosis because there is evidence of mania and narcissistic behavior. Doc. 15, p. 15. However, the ALJ considered the fact that Peshe experienced periods of mania, was talkative, and exhibited narcissistic behavior. Tr. 20. Further, contrary to Peshe's suggestion, consistent with the ALJ's finding, mental status examination findings generally reflected logical and organized thought process and no psychotic thoughts. *See* Tr. 483, 532, 563, 1029, 1045.

Peshe also contends that the ALJ erred when he concluded that the record did not disclose mood swings. Doc. 15, p. 16. However, the ALJ did not conclude that there was no evidence of mood swings. In fact the ALJ concluded that one of Peshe's severe impairments was bipolar disorder (Tr. 19) but concluded that there was no evidence of *extreme* mood changes (Tr. 22). Peshe has not shown that the ALJ's determination that there was no evidence of *extreme* mood changes (Tr. 22) is unsupported by the record. Additionally, Dr. Johnson's diagnosis of bipolar disorder does not mandate a finding of disabled. *See e.g., Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir.1998)* ("The mere diagnosis of [a condition] ... says nothing about the severity of the condition.").

Further, Peshe's claim that, had Dr. Johnson's opinion been provided weight, the decision would have been different is based on a faulty reading of Dr. Johnson's opinion. In making the foregoing claim, Peshe asserts that Dr. Johnson concluded that Peshe would not be able to work with others at all. Doc. 15, p. 16. However, Dr. Johnson did not rate Peshe completely unable to perform in any category. Tr. 961-962. Rather, the lowest rating Dr. Johnson scored Peshe in any

category, including in social interaction categories, was a "4" which corresponds to having the ability to perform the task or function but with noticeable difficulty more than 20 percent of the work day or work week.  Tr. 961-962.  Thus, contrary to Peshe's claim, Dr. Johnson's opinion does not support a conclusion that Peshe was completely unable to work with others.   Nor has Peshe shown that the ALJ's mental RFC limitation of "simple routine tasks in a low stress setting (no fast pace, strict quotas or frequent duty changes), in a non-public setting involving superficial interpersonal interactions" (Tr.  21) did not adequately account for limitations contained in Dr. Johnson's opinion.[12]  *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir.2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." ).

In accordance with the treating physician rule, the ALJ considered and weighed the opinion of Peshe's treating psychiatrist Dr. Johnson.  Peshe has not demonstrated error with respect to the ALJ's conclusion that Dr. Johnson's opinion was not supported by the record.  Nor has Peshe shown that, if Dr. Johnson's opinion was provided weight, a finding of disabled would be warranted.  Accordingly, Peshe has failed to demonstrate that remand is required for further consideration of Dr. Johnson's opinion.

## 2. __Dr. Misja__

Peshe also argues that the ALJ erred in assessing the opinion of consultative psychologist Dr. Misja because the ALJ did not discuss Dr. Misja's opinion nor indicate what weight he was assigning to Dr.  Misja's opinion.  Doc. 15, pp. 17-19.

---

[12] Peshe's additional argument that the outcome was affected by the ALJ's evaluation of Johnson's opinion because Dr. Johnson opined that Peshe would likely miss three days per month is without merit.  Doc. 15, pp. 16-17.  The VE testified that there would be a reduction in the number of jobs available if an individual would likely miss three days per month but did not indicate that all jobs would be eliminated.  Tr. 54-55.

Dr. Misja was not a treating source.  Thus, his opinion is not subject to treating physician rule analysis.  Nonetheless, as part of his RFC assessment analysis, the ALJ considered Dr. Misja's opinion and evidence concerning his findings from his consultative evaluation, stating:

> The psychological consultative examination results obtained by Charles Misja, Ph.D., note that the claimant dropped out of school due to tics and that he used drugs to cope with problems, which have included legal system encounters (exh 10F).  Dr. Misja also commented on the claimant's exaggerated symptomology and reported a global assessment of functioning score of 60, consistent with only moderate symptoms and functional limitations (exh. 10F).

Tr. 22-23.

Peshe's claim that the ALJ's failure to explicitly state the weight assigned to Dr. Misja's opinion serves as a basis for reversal or remand is without merit.  *See e.g., Reeves v. Comm'r of Soc. Sec.*, 2015 WL 4231600, *6 (6th Cir. July 13, 2015) (finding no error where the ALJ did not assign a particular weight to a non-treating physician's opinion).  While the ALJ did not explicitly assign weight, the ALJ considered the opinion, including Dr. Misja's GAF assessment score indicating moderate symptoms and functional limitations.  *See Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 468 (6th Cir. 2004) (finding that the ALJ had adequately addressed a consultative examiner's opinion).

Further, even if the ALJ should have explicitly assigned weight to Dr. Misja's opinion but failed to do so, Peshe has not demonstrated that the ALJ's decision is not supported by substantial evidence nor that the error was not harmless.  *Id.* (recognizing application of harmless error with respect to an ALJ's consideration of a consultative examiner's opinion).

Peshe argues that Dr. Misja's opinion *suggests* that greater limitations should have been included in the RFC.  Doc. 15, p. 18 (emphasis supplied).  However, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 404.1545(a); 20

C.F.R. § 404.1546(c).  "[T]he ALJ—not a physician—ultimately determines a Plaintiff's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010).  Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).

Consistent with the Regulations, when assessing Peshe's RFC, the ALJ considered the medical opinion evidence, including the opinions of Dr. Johnson, Dr. Misja, and the state agency reviewing physicians, as well as Peshe's subjective complaints, treatment history, and activities of daily living.  Tr.  20-21, 22-23.   In doing so, the ALJ assessed Peshe as having the mental RFC to "perform simple routine tasks in a low stress setting (no fast pace, strict quotas or frequent duty changes), in a non-public setting involving superficial interpersonal interactions." Tr. 21.  Dr. Misja concluded that Peshe would *likely* have problems in the moderate to severe range in maintaining attention and concentration and persistence and pace, would *likely* have problems in the severe range in responding appropriately to supervision and to coworkers in a work setting, and would *likely* have problems in the severe range in responding appropriately to work pressures in a work setting.  Tr. 478-479 (emphasis supplied).  As noted by the ALJ, Dr. Misja noted that Peshe exaggerated at times and assessed a GAF score of 60, consistent with moderate symptoms and functional limitations.  Tr. 23, 477, 478.  Peshe has not shown that the ALJ's RFC assessment is inconsistent with Dr. Misja's opinion or that it does not adequately account for limitations contained in Dr. Misja's opinion.

Further, the ALJ relied in part upon and concurred in the opinions of the state agency reviewing physicians who opined that Peshe had mild limitations in activities of daily living and moderate limitations in social functioning and in maintaining concentration, persistence or pace.

Tr. 20-21, 23, 68, 98.  Peshe has not demonstrated that the ALJ's RFC assessment does not adequately account for the moderate limitations in social functioning and/or moderate limitation in concentration, persistence or pace found by the ALJ and supported by the record.

The ALJ clearly considered Dr. Misja's opinion and Peshe has not shown that the ALJ's failure to explicitly assign weight to Dr. Misja's opinion amounts to reversible error.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

October 22, 2015

Kathleen B. Burke
United States Magistrate Judge